**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

THOMAS HENDRIAN,

          Plaintiff,

    v.

ASTRAZENECA PHARMACEUTICALS
LP, et al.,

          Defendants,

:  Civil No. 3:13-CV-00775
:
:  (Judge Mariani)
:
:
:
:
:
:
:

## MEMORANDUM OPINION

## I. INTRODUCTION

In this lawsuit, Plaintiff Thomas Hendrian brings federal claims under ERISA against

his former employer and its pension plan. Presently pending before the Court is Defendants'

motion for summary judgment. For reasons set forth below, the motion is denied.

## II. PROCEDURAL HISTORY

Plaintiff Thomas Hendrian commenced this action on March 26, 2013, by filing a

complaint against Defendants AstraZeneca Pharmaceuticals, LP, and AstraZeneca Defined

Benefit Pension Plan. (Doc. 1). Hendrian alleges federal causes of action under the

Employee Retirement Income Security Act of 1974. Defendants filed an answer on May 28,

2013. (Doc. 7). On February 10, 2014, Defendants moved for summary judgment. (Doc.

18). Supporting materials were submitted the same day. (*Id.*). Plaintiff timely filed opposition

materials on February 28, 2014. (Docs. 19, 20). Defendants submitted a reply brief on March 17, 2014. (Doc. 21).

## III. STATEMENT OF UNDISPUTED FACTS

The following statement of undisputed facts is drawn from Defendants' statement of facts (Doc. 18-2), Plaintiff's counterstatement of facts (Doc. 19), and the underlying documents. The facts are set forth in the light most favorable to Plaintiff, the non-moving party.

Plaintiff Thomas Hendrian was employed by Defendant AstraZeneca Pharmaceuticals LP as a sales representative until termination of his employment in February of 2009. (Doc. 18-2, ¶ 1). Due to his age and years of service, Hendrian was immediately eligible for early retirement benefits under the terms of the AstraZeneca Defined Benefit Pension Plan (the "Plan"). (Doc. 18-2, ¶ 2). In October of 2009, Hendrian notified the AstraZeneca Benefits Center of his intent to receive benefits commencing January 1, 2010. (Pl. Dep., pp. 30:19-31:8, Doc. 19-2, Ex. A). At the time, Hendrian believed that Mercer was the plan administrator, and that when dealing with the AstraZeneca Benefits Center he was actually dealing with Mercer. (*Id.* at 31:18-32:17). On October 13, the AstraZeneca Benefits Center sent Hendrian a Benefit Notice and Election Package. (*Id.*; Election Package, Doc. 18-3, Ex. C).

The Election Package explained the various forms of benefits options available to Hendrian. (*Id.*). The cover letter advised that the included benefit calculations could differ

2

from the final benefit calculation depending on Hendrian's final pay, his last day of employment, and actuarial assumptions. (*Id.* at 1). The letter further advised Hendrian that he would be notified of any resulting change in benefits no later than six months after his last day of employment. (*Id.*). The Election Package included a section entitled "Explanation of Pension Options" that informed Hendrian the "Legacy Zeneca Pension Plan benefit formula" had been used to calculate his benefits. (*Id.* at 8). That section instructed Hendrian to refer to the Summary Plan Description for additional details on provisions affecting his benefits. (*Id.*).

After discussing and comparing the various forms of benefits with his wife, Mari Hendrian, Hendrian made a decision based on his need for fixed income and his desire to protect his wife should he predecease her. (Pl. Dep., p. 33; M. Hendrian Dep., p. 12:1-6, Doc. 19-3, Ex. B).  When making his election, Hendrian never performed an exact benefit calculation that took into account the actuarial variables. (Pl. Dep., p. 38). Instead, Hendrian evaluated the options and checked the calculations in the Benefits Package by verifying the accuracy of employment data used to derive the benefit estimates. (*Id.*). Hendrian never looked at the actual Plan documents or discussed his benefits with anyone at AstraZeneca prior to making his election. (*Id.* at 39-41).

Hendrian ultimately elected the "Level Income with Social Security at Age 65 with 100% Joint and Survivor Annuity" form of benefit. (Pl. Dep., pp. 32-33). He did so by signing and returning the "Pension Options Form." (Pension Options Form, Doc. 18-3, Ex. D). The

Pension Options Form stated that Hendrian's rights and benefits were contingent upon the terms and conditions of the Plan and that his completion of the form did not guarantee an entitlement to benefits under the Plan. (*Id.*). That form reiterated that the stated benefit amounts had been determined under the Legacy Zeneca Pension Plan benefit formula and were subject to a final recalculation. (*Id.*). Under the selected form of benefit payment, Hendrian's estimated monthly benefits were $3,828.67 until age 65 and $1,745.67 thereafter with a $2,439.41 monthly annuity payment to Ms. Hendrian in the event he predeceased her. (*Id.*). On January 8, 2010, the AstraZeneca Benefits Center informed Hendrian that benefits would commence in the above stated amounts. (Verification Letter, Doc. 18-3, Ex. F). Hendrian thereafter began to receive monthly payments in the amount of $3,828.67. (Doc. 18-2, ¶ 10).

In 2010, AstraZeneca hired a consulting firm to conduct compliance and operational reviews of the Pension Plan to make sure that Mercer was administering the Plan in accordance with its terms. (Wersinger Dep., p. 7, Doc. 18-3, Ex. G). In April of 2011, these reviews uncovered a number of overpayments and underpayments. (*Id.* at 7-8). The following year, Mercer implemented a program designed to check the accuracy of its pension calculations. (*Id.* at 10). In June of 2012, that program identified problems with the calculations of certain Level Income Option benefits. (*Id.* at 11-12). Contrary to the terms of the Plan, the actuarial equivalence factor used to calculate Hendrian's benefits was based

on a 5% interest rate rather than historic bond yields. (*Id.*; Doc. 18-3, Ex. A, § 1.2, Am. No. 3).

In a letter dated October 9, 2012, the AstraZeneca Benefits Center notified Hendrian that his benefits had been miscalculated resulting in a $72.18 monthly overpayment. (Overpayment Notification, Ex. 18-3, Ex. I). The survivor benefit payable to Mari Hendrian was not changed. (*Id.*). The letter informed Hendrian that he could either return the cumulative overpayment amount of $2,309.61 by November 5 or allow his future payments to be further reduced. (*Id.*). In a response addressed to the AZ Benefits Center, Hendrian disputed his liability for any overpayments and objected to any reduction in his monthly benefits. (Doc. 18-3, Ex. K). On November 5, 2012, AstraZeneca rejected Hendrian's objection but allowed him an additional thirty days to submit a check for the entire amount of the overpayment. (Doc. 18-3, Ex. L). Hendrian retained counsel and appealed the matter to the AstraZeneca Administration Committee by letter dated November 30, 2012. (Doc. 18-3, Ex. M). The appeal was denied on January 24, 2013 and Hendrian's monthly payments were reduced. (Doc. 18-3, Ex. O; Doc. 19-14). Hendrian commenced this lawsuit two months later. (Doc. 1).

## IV. STATEMENT OF DISPUTED FACTS

The parties dispute whether Hendrian relied on the $72 per month overpayment. (Doc. 19, ¶ 24). In deposition, Hendrian testified that when he agreed upon the terms of the pension, he relied upon AstraZeneca for correct figures. (Pl. Dep., p. 56:7-15). For instance,

Hendrian relied upon the estimates provided in his election package in order to compare the various options and determine which made the most financial sense. (*Id.* at 28-29, 33-34, 38:10-14, 56:7-15). Hendrian also indicated that he elected not to seek other employment in reliance upon his pension estimate, but may have done so had his estimate been different. (*Id.* at 77-78, 81). Finally, Hendrian testified that he spent the entire $3,828 each month on household and other expenses, and that he adjusted those expenses in reliance upon receiving that amount. (*Id.* at 65-66).

Following the reduction of benefits, however, Hendrian could not identify any specific expenses that he had to eliminate or that he has been unable to pay. (*Id.* at 81-82, 95). Hendrian was also unable to identify anything that he would have done differently had he received an accurate estimate of his benefits in 2009. (*Id.*). While Hendrian testified it was possible that he may have sought other employment had his pension estimate been different, he had no job opportunities at the time of his retirement and he was unable to state whether a $75 difference in monthly benefits would have changed his employment decisions. (*Id.* at 78, 81). Hendrian also stated that he is not currently seeking employment. (*Id.* at 73). Mari Hendrian, for her part, neither made any specific purchases nor incurred any future obligations in reliance upon their monthly benefit. (M. Hendrian Dep., p. 13:1-11). Nor did Ms. Hendrian alter her expenditures, forgo consumption, or otherwise reorganize her finances following the reduction of their monthly benefit. (*Id.* at 15-16).

## V. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party moving for

summary judgment bears the burden of showing the absence of a genuine issue as to any

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed.

265 (1986). Once such a showing has been made, the nonmoving party must offer specific

facts contradicting those averred by the movant to establish a genuine issue of material fact.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695

(1990). "Inferences should be drawn in the light most favorable to the non-moving party,

and where the non-moving party's evidence contradicts the movant's, then the non-

movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d

1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## VI. ANALYSIS

### A. Denial of Benefits (Count I)

Hendrian's first claim is an action for benefits under section 502(a)(1)(B) of ERISA.

Section 502(a)(1)(B) confers on plan participants a right of action to recover benefits due,

enforce rights, or clarify the right to future benefits under the terms of an employee pension

7

benefit plan. 29 U.S.C. § 1132(a)(1)(B). In order to recover under this provision, a plan participant must demonstrate that he has a right to benefits that is legally enforceable under the plan and that the plan administrator improperly denied those benefits. *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).

### 1. Hendrian's Right to Benefits Under the Plan

Hendrian alleges that the reduction of his benefits more than six months after his last day of employment constitutes a breach of the Plan. (Doc. 1, ¶ 20). Accordingly, Hendrian requests that his monthly benefits be restored to the original amount of $3,828 per month. (*Id.* at ¶ 22). Defendants argue that summary judgment is proper because Hendrian was never entitled under the Plan to the amount of benefits he initially received. (Doc. 18-1, p. 9). In support of their position, Defendants rely upon the benefits calculation set forth in section 1.2 of the Plan instrument. (*Id.*). In opposing summary judgment, Hendrian points out that the pension election materials stated that that his benefit calculation would become final within six months of his last day of employment (Doc. 19, p. 2).

As an initial matter, there is no genuine dispute that Hendrian's monthly benefit payments were improperly calculated under the terms of the Plan. (*See* Doc. 18-2, ¶¶ 12-15; Doc. 19, p. 3). Hendrian selected the "Level Income with Social Security at Age 65 with 100% Joint and Survivor Annuity" optional form of benefit. (Pl. Dep., pp. 32-33). The Plan provides that this form of benefit "shall be adjusted so that it is the Actuarial Equivalent of a single life annuity." (Plan Shell Document, § 4.1.5, Doc. 18-3, Ex. A). For purposes of this

8

adjustment, the Plan specifies that the interest rate be determined pursuant to sections 417(e)(2) and 430(h)(2)(C) of the Internal Revenue Code. (Plan Shell Document, § 4.1.5; *id.* § 1.2.3, Am. No. 9). Specifically, the Plan states that "the interest rate used shall be the adjusted first, second and third segment rates applied under rules similar to [I.R.C. § 430(h)(2)(C)] for the fourth full calendar month preceeding the month in which the distribution is made . . . ." (Plan Am. No. 9 § 1.2.3). Hendrian's initial monthly amount of $3,828, however, was based on a present value calculation that used a 5% interest rate instead of the applicable segment rates. (Doc. 19, p. 3; Doc. 18-2, ¶ 13). Accordingly, Hendrian's monthly benefits were not calculated according to the terms of the Plan.

In opposing summary judgment, Hendrian points out that the Election Package materials implied that his benefit calculation of $3,828 would become final within six months of his retirement. (Doc. 19, p. 2). Relying on the 2008 Third Circuit decision *Pell v. E.I. DuPont de Nemours & Co.*, 539 F.3d 292, Hendrian argues that section 502(a)(1)(B) of ERISA permits recovery of the amounts stated in the Election Package even though those benefits exceed what the Plan actually provides. (Def. Br., pp. 9-10, Doc. 20). The case law does not support Hendrian's arguments.

First, *Pell* is inapplicable in the context of an action for benefits. The plaintiff in *Pell* sought equitable relief in a suit brought under section 502(a)(3) of ERISA. Here, Hendrian seeks to recover benefits under section 502(a)(1)(B). That section does not authorize relief beyond the terms of the Plan. *See CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1877-78 (2011)

("The statutory language [of section 502(a)(1)(B)] speaks of '*enforcing*' the 'terms of the plan,' not of *changing* them.") (emphasis in original). Second, contrary to Hendrian's contentions, representations made in Hendrian's Election Package are not enforceable under section 502(a)(1)(B).[1] *Id.* In *Amara*, the Supreme Court held that summary plan documents do not constitute terms of a plan that are enforceable in a section 502(a)(1)(B) action for benefits. *Id.* The Court's holding in *Amara* encompasses pension election materials. For instance, in *Keiser*, the court upheld an administrator's decision to deny benefits based on the plan language, notwithstanding the plaintiff's reliance upon conflicting language in the pension election documents. *Keiser v. Conagra Foods, Inc.*, _ F. Supp. 3d _, 2014 WL 5463868, *9-10 (M.D. Pa. Oct. 27, 2014). Here, as in *Keiser*, the terms of the Plan control over conflicting provisions in Hendrian's Election Package. Therefore, for purposes of section 502(a)(1)(B), Hendrian cannot recover the $3,828 monthly amount stated in the Election Package because he was not entitled to that amount under the terms of the Plan.

Defendants have not met their burden of establishing the absence of a genuine issue for trial with respect to the amount of benefits Hendrian *is* entitled to under the Plan. As the moving party, however, Defendants have the initial burden of producing "affirmative evidence that negates an essential element of the nonmoving party's claim." *Celotex Corp.*

---

[1] Indeed, the Election Package stated that "in the event of any conflict between the official Plan documents and this Explanation of Pension Options, the Plan document must govern." (Doc. 18-3, Ex. D).

*v. Catrett*, 477 U.S. 317, 330-31 (1986) (Brennan, J., dissenting)[2]. If Defendants "have not

fully discharged this initial burden of production, [their] motion for summary judgment must

be denied." *Id.* at 332. Moreover, even where no opposing evidentiary matter is presented,

summary judgment should be denied if the evidence in support of the motion does not

establish the absence of a genuine issue or the moving party's own papers demonstrate the

existence of material factual issues. Fed. R. Civ. P. 56, Advisory Committee Notes; *Drexel*

*v. Union Prescription Centers, Inc.*, 582 F.2d 781, 790 (3d Cir. 1978).

Here, Defendants established that Hendrian's initial monthly amount was incorrect

because their calculations did not utilize the "adjusted first, second and third segment rates

applied under rules similar to [I.R.C. § 430(h)(2)(C)] for the fourth full calendar month

preceding the month in which the distribution is made." (Plan Am. No. 9 § 1.2.3).

Defendants' supporting materials, however, did not specify what the applicable segment

rates were, how those rates were applied, or what the "rules similar to I.R.C. § 430(h)(2)(C)"

are. Instead, Defendants support their assertion that Hendrian's overpayment was $72 per

month by citing a notification letter sent to Hendrian. (Doc. 18-2, ¶ 16; Doc. 18-3, Ex. I).

While that letter contains the purportedly "Correct Actuarial Equivalence Factor" used to

derive the $72 monthly overpayment, it does not provide the applicable segment rates or

actuarial variables that are needed in order to determine whether that factor is in fact

"correct" under the terms of the Plan. Without such information or related expert testimony,

---

[2] *See In re Bressman*, 327 F.3d at 237 n.3 (3d Cir. 2003) (noting that Justice Brennan's dissent in *Celotex* did not differ from the Court's opinion regarding the appropriate standards for summary judgment).

Defendants have not discharged their initial burden of establishing the absence of a genuine issue as to the "correct" amount of Hendrian's benefits.

### 2. Denial of Benefits

Irrespective of what he is entitled to under the Plan, Hendrian also claims Defendants improperly denied him benefits by reducing his payments in order to recoup the alleged overpayments. (Doc. 1, p. 13). Defendants argue that they are entitled to summary judgment because Hendrian was never entitled under the Plan to the amount of benefits he initially received, and that no provision of the Plan allows him to retain the excess payments. (Doc. 18-1, p. 9). Hendrian responds in kind by noting that no provision of the Plan *authorizes* Defendants to unilaterally reduce his benefits or recover overpayments. (Doc. 19, pp. 3, 11).

A denial of benefits is reviewed *de novo* unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan grants such discretionary authority, a denial of benefits is reviewed under an arbitrary and capricious standard. *Fleisher*, 679 F.3d at 120. Here, the Plan provides that the administrator "shall have the exclusive right to interpret, construe, and implement the provisions of the Plan and to decide all questions concerning the Plan and its administration, to include, without limitation, the determination of eligibility for and the amount of any benefits." (Doc. 18-3, Ex. A, § 8.6). Since Defendants have discretionary

12

authority to construe the Plan and determine the amount of Hendrian's benefits, their

decision to reduce his benefits is reviewed under an arbitrary and capricious standard.

*Fleisher*, 679 F.3d at 121-22 (concluding arbitrary and capricious standard of review applied

where plan vested administer with "full and exclusive authority to control and manage the

[plan], to administer claims, and to interpret the [plan] and resolve any questions arising in

the administration, interpretation, and application of the [plan]"); *see also Bocchino v.*

*Trustees*, 336 Fed. Appx. 197 (3d Cir. 2009) (concluding district court properly applied

arbitrary and capricious standard in upholding plan's decision to reduce benefits of

beneficiary who had erroneously received overpayments). A decision is arbitrary and

capricious if "it is without reason, unsupported by substantial evidence or erroneous as a

matter of law." *Fleisher*, 679 F.3d at 121.

     In this case, the parties agree that the terms of the Plan do not expressly authorize

recoupment of overpayments. (*See* Doc. 18-3, Ex. A). Hence, the issue is whether the

Defendants' decision to reduce Hendrian's benefits was arbitrary and capricious given the

absence of a provision in the Plan permitting recoupment. The Court is not aware of any

controlling authority addressing a denial of benefits claim premised upon a plan's non-

contractual recoupment of alleged overpayments to a beneficiary. *But cf.* 26 C.F.R. §

1.401(a)-13 (excluding "*arrangement[s]* for the recovery by the plan of overpayments of

benefits" from definition of "assignment" and "alienation" in ERISA anti-alienation clause)

(emphasis added). In other circuits, district courts have held that an ERISA plan may

exercise "extra-statutory" devices to recoup benefit overpayments even if not specifically authorized in the plan terms.[3] *See Phillips v. Maritime Assn.-ILA Local Pension Plan*, 194 F. Supp. 2d 549, 555 (E.D. Tex. 2001) (noting that "ample case law demonstrates that plans can recoup" benefit overpayments). The Court therefore determines that whether Defendants' decision to recoup Hendrian's overpayments was erroneous under the arbitrary and capricious standard is an issue for trial.

Nevertheless, Defendants are not entitled to summary judgment. Under the arbitrary and capricious standard, "[c]ourts defer to an administrator's findings of facts when they are supported by 'substantial evidence,' which [is] 'defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Fleisher*, 679 F.3d at 121 (citation omitted). As discussed above, Defendants did not provide the applicable segment rates or other actuarial information needed to correctly calculate Hendrian's benefits under the Plan. It follows that Defendants have not provided information that is needed to correctly calculate the amount of Hendrian's overpayment. Hence, based on the limited record before the Court, Defendants have not provided evidence "that a reasonable mind might accept as adequate to support a conclusion" as to the amount of Hendrian's overpayment. Since Defendants have not established that their calculation of Hendrian's

---

[3] Those cases analyze the issue under the principles of equitable restitution. *Phillips*, 194 F. Supp. 2d at 555. In *Bocchino v. Trustees*, 2008 WL 1844298 (D.N.J. 2008), *aff'd*, 336 Fed. Appx. 197 (3d Cir. 2009), an unpublished decision, a beneficiary who erroneously received monthly overpayments brought an action for benefits under section 502(a)(1)(B) to prevent the plan from demanding reimbursement. The district court analyzed the matter under common law restitution principles.

overpayment is supported by substantial evidence, they are not entitled to summary judgment on the denial of benefits claim.

## B. Breach of Fiduciary Duty (Count IV)

In Count IV of the complaint, Hendrian alleges that AstraZeneca breached its fiduciary duties by making misrepresentations about his benefit calculations. (Doc. 1, ¶ 35). To establish a breach of fiduciary duty premised upon a misrepresentation or omission, a plaintiff must demonstrate that: (1) the defendant was acting in a fiduciary capacity; (2) the defendant made affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries; (3) the misrepresentation or inadequate disclosure was material; and (4) the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure. *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009). We analyze each element in turn.

### 1. Fiduciary Status

Fiduciary status is broadly construed under ERISA. *Smith v. Hartford Ins. Group,* 6 F.3d 131, 141 (3d Cir. 1993). ERISA provides that a "person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). In addition to meeting the statutory definition, fiduciary status can also be obtained by being

15

named as the fiduciary under a plan instrument or being named as a fiduciary pursuant to a

procedure specified in the plan instrument. *Glaziers & Glassworkers v. Newbridge Sec.*, 93

F.3d 1171, 1179 (3d Cir. 1996) (citing 29 U.S.C. § 1102(a)). Thus, a fiduciary is defined in

functional terms of control and authority over the plan. *In re Unisys*, 579 F.3d at 228.

Discretionary authority or discretionary responsibility in the administration of a plan is

required. *Id.* (citing *Varity Corp. v. Howe*, 516 U.S. 489 (1996)).

Fiduciary duties, however, only attach to particular persons performing particular

functions. *In re Unisys*, 579 F.3d at 228. The question is whether the defendant was acting

as a fiduciary with respect to the particular activity at issue. *Renfro v. Unisys Corp.*, 671

F.3d 314, 321-22 (3d Cir. 2011). An employer who is also a plan administrator acts as a

fiduciary when explaining plan benefits to its employees. *In re Unisys*, 579 F.3d at 228. In

*Curcio*, for instance, the court concluded the defendant-employer, who had labeled itself a

plan administrator in the employee benefits booklet, was subject to liability as a fiduciary for

misrepresentations in solicitation materials it distributed regarding a supplemental insurance

plan. *Curcio*, 33 F.3d at 234. Similarly, in *Unisys*, the Third Circuit affirmed the district

court's determination that an employer-administrator acted as a fiduciary when its agents

communicated with participants about plan benefits and had actual or apparent authority to

make such communications. *In re Unisys*, 579 F.3d at 228. More generally, a plan

administrator is subject to liability for the misrepresentations of non-fiduciary agents acting

with actual or apparent authority to assist in the discharge of fiduciary responsibilities. *Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 987-89 (3d Cir. 1995).

Here, Defendants argue that the Plan itself is not a fiduciary and therefore not a proper defendant in a breach of fiduciary duty claim. (Doc. 18-1, p. 13). Count IV of the complaint, however, states allegations only against Defendant AstraZeneca. (Doc. 1, ¶¶ 34-37). Defendants next argue that AstraZeneca was not a fiduciary with respect to the communications at issue. (Doc. 18-1, p. 13). We disagree.

Under the terms of the Plan, the responsibilities for Plan administration are allocated among AstraZeneca, the Administration Committee, the Investment Committee, and other entities. (Plan Terms, Art. VIII, Doc. 18-3, Ex. A). As a Plan administrator, AstraZeneca is a fiduciary because it exercises discretionary authority and responsibility with respect to Plan management, administration, and operations. For example, AstraZeneca is charged with appointing members of the Committee and overseeing its performance and Plan administration. (*Id.* § 8.1). AstraZeneca also retains authority to assign administrative and operational duties to the Committee. (*Id.* § 8.2.1). Finally, as Plan administrator, AstraZeneca performs fiduciary functions beyond the powers expressly conferred by the Plan instrument. Indeed, AstraZeneca informed Plan participants that it was "AstraZeneca's duty, as a fiduciary to the Plan, to recover overpayments and return those funds to the . . . Trust." (Doc. 18-3, Ex. I, p. 2).

In its capacity as a fiduciary, AstraZeneca delegated certain administrative responsibilities to Mercer. (Wersinger Dep., pp. 7-8, 14). These responsibilities included communicating with plan participants about benefits estimates and eligibility, calculating payments, and recovering overpayments. (*Id.*; Doc. 19-5, Interrog. No. 2). Mercer therefore acted as an agent that assisted AstraZeneca in discharging its fiduciary responsibility of administering the Plan. *See Taylor*, 49 F.3d at 987-88 (concluding that non-fiduciary agent who advised employees of rights and options under plan and prepared reports concerning benefits acted to assist plan administrator in discharging its fiduciary obligation to control and manage the operation and administration of the plan). Here, as in *Unisys*, AstraZeneca acted as a fiduciary when its agent, with actual or apparent authority, communicated with Hendrian about his benefits and options under the plan. Since those communications allegedly misrepresented the amount of Hendrian's benefits, AstraZeneca acted in a fiduciary capacity with respect to the conduct at issue.

### 2. Material Misrepresentation

To prevail at trial, Hendrian must establish that the miscalculation of his pension amounts to a material misrepresentation. Materiality is a mixed question of law and fact. *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993). Summary judgment on the question of materiality is appropriate only if reasonable minds cannot differ. *Id.*

A misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision or a

harmful decision regarding benefits. *In re Unisys*, 579 F.3d at 228. A reasonable employee would consider the amount of his pension when evaluating whether he or she can afford to retire. *Pell v. E.I. DuPont de Nemours & Co.*, 539 F.3d 292, 300 (3d Cir. 2008). In *Pell*, for example, the court concluded that the defendant-employer's misrepresentation regarding an employee's benefit calculation date was material since the calculation date determined the employee's pension amount.

In the instant case, the miscalculation overstated Hendrian's monthly benefit by $72.18, or approximately 2%. According to Defendants, "an error of this magnitude is simply not material." (Doc. 18-1, p. 14). We do not agree, and instead see this as an issue for trial. Reasonable minds could differ as to whether a $72 per month overstatement would lead an employee to make an inadequately informed retirement decision. One could find it reasonable for an employee to consider his monthly pension amount when determining whether or not he can afford to retire. 539 F.3d at 300. An employee who anticipates spending his last dollar each month on a $70 supplemental insurance premium, or a $70 prescription, might be found to have been misled. Similarly, reasonable minds could differ as to whether a 2% reduction in lifetime benefits would lead an employee to make an inadequately informed retirement decision. An employee who anticipates a 2% yearly cost-of-living increase could be found to have been misled. *Cf.* 79 Fed. Reg. 64455 (providing notice of 1.7% cost-of-living increase in Social Security benefits effective December 2014).

In sum, we cannot conclude that the miscalculation of Hendrian's benefits was immaterial as a matter of law.

Defendants also argue that a "mere mistake in communication between a Plan and a participant does not constitute a breach of fiduciary duty." (Doc. 18-1, p. 13). That is not an accurate statement of the law. As the Third Circuit explained:

> It is true that making out a valid claim under § 1132(a)(2) requires proving a breach of fiduciary duty, which, in certain circumstances, requires a showing of fault (negligence or bad faith). . . . But this claim is brought under § 1132(a)(3), and making out such a claim does not require bad faith; it merely requires a violation of ERISA. Thus, the District Court's conclusion [regarding] bad faith is not relevant to this claim. All that matters is the District Court's conclusion on summary judgment that [the] withdrawal from the Pension Plan violated ERISA.

*Leckey v. Stefano*, 501 F.3d 212, 229 (3d Cir. 2007). Since Hendrian's claim is brought under § 1132(a)(3), the misrepresentation need not have been made in bad faith.

### 3. Detrimental Reliance

Detrimental reliance encompasses both an injury and reasonableness. *Shook v. Avaya Inc.*, 625 F.3d 69, 73 (3d Cir. 2010). To establish this element, the plaintiff must have reasonably taken some action, or refrained from taking certain actions, regarding benefits or retirement as a result of the misrepresentation. *Id.* at 73-74; *Pell*, 539 F.3d at 301-03. The plaintiff must also demonstrate that he relied upon the misrepresentation in a way that later led to injury. 539 F.3d at 303. For instance, important financial decisions such as electing to retire, declining other employment, or forgoing the opportunity to purchase supplemental insurance constitutes detrimental reliance. *In re Unisys*, 579 F.3d at 229; *see also Pell*, 539

F.3d at 303 (concluding employee detrimentally relied on misleading benefit estimates by accepting position with lower salary and refraining from seeking alternative employment opportunities with superior pension benefits).

On the other hand, the mere expectation of a continued benefit is not enough to establish detrimental reliance. *Shook*, 625 F.3d at 73. Nor does detrimental reliance include actions that are unrelated to any decision regarding retirement or benefits under the plan. *See Shook*, 625 F.3d at 74-75. As the Third Circuit has explained, "[i]n prior decisions where we have found detrimental reliance . . . the common thread has been that the alleged misrepresentation caused an employee participant or beneficiary to make a decision regarding benefits or retirement that is related to the *employee's* plan." *Id.* at 74 (emphasis in original). In *Shook*, for example, an employee's wife decided to retire from her job as a result of misrepresentations regarding her husband's pension benefits. *Id.* at 71, 74. The Third Circuit held that the wife's retirement decision did not constitute detrimental reliance because her actions did not implicate her or her husband's benefits under the plan. *Id.*

In this case, Defendants argue that summary judgment is appropriate because Hendrian cannot establish that he detrimentally relied upon the Plan's alleged misrepresentations. (Doc. 18-1, pp. 14-16). In support of their position, Defendants cite testimony in which Hendrian was unable to identify anything that he would have done differently had he received an accurate estimate of his benefits in 2009. (*Id.* at 95). Defendants also point out that Hendrian has not had any job opportunities available to him

following his retirement from AstraZeneca and that he is not currently seeking employment. (Pl. Dep., pp. 73, 81). In deposition testimony, Hendrian was unable to state whether his decision not to seek other employment would have changed as a result of the $75 difference in monthly benefits. (*Id.* at 78). Defendants also claim that based on his financial preferences, Hendrian would have made the same benefit election had the estimates been correctly calculated. (*Id.* at 28:12-29:11, 33, 80:21-81:8; Def. Br., p. 15). Finally, Defendants note that Hendrian could not identify any specific expenses that he had to eliminate or that he has been unable to pay as a result of the reduction in benefits. (Pl. Dep., pp. 81-82, 95).

Defendants have "ma[de] a prima facie showing that [they are] entitled to summary judgment." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). The burden thus shifts to Hendrian, the non-moving party, to respond by identifying specific facts, supported by materials in the record, which raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c). To that end, Hendrian cites deposition testimony indicating that he spent the entire $3,828 each month on household and other expenses, and that he adjusted those expenses in reliance upon receiving that amount. (*Id.* at 65-66). Hendrian also indicated that he elected not to seek other employment in reliance upon his pension estimate, but may have done so had his estimate been different. (*Id.* at 77-78, 81). Finally, Hendrian testified that he relied upon the figures provided in his election package in order to compare the various options and determine which made the most financial sense. (Pl. Dep., pp. 28-29, 33-34, 38:10-14, 56:7-15).

The Court concludes that there is a genuine issue for trial as to whether Hendrian detrimentally relied upon the miscalculated pension estimates. First, there is a factual dispute regarding Hendrian's retirement decision. To be sure, Hendrian's decision to retire from AstraZeneca could not have been based on the estimated pension benefits because he was involuntarily terminated. (Pl. Dep., p. 16, Doc. 19-2, Ex. A). Defendants thus emphasize that Hendrian has not had any job opportunities available to him since his separation from AstraZeneca and that he is not currently seeking employment. Yet, Hendrian testified that his decision not to seek other employment was based on his pension estimate and that he may have sought other opportunities had his estimate been different. (Pl. Dep., pp. 77-78, 81). In the Third Circuit, "refraining from taking action can constitute detrimental reliance." *Pell*, 539 F.3d at 303; *see also In Re Unisys*, 579 F.3d at 229 ("[D]etrimental reliance . . . may encompass decisions to decline other employment opportunities."). Therefore, whether Hendrian—a college graduate with 30 years of experience selling financial and pharmaceutical products who was 59 years of age at retirement—[4]could and would have sought other employment had his pension been accurately calculated is a disputed material fact that cannot be resolved on summary judgment. *Cf. Pell*, 539 F.3d at 303, n.5 ("It is reasonable to believe that [plaintiff], an engineer with a Ph.D., an MBA, and an employment history with Consol and DuPont, could have found alternative employment . . . .").

---

[4] *See* Pl. Dep., pp. 10, 13-15.

23

Second, there is a factual dispute regarding Hendrian's benefits decision.

Defendants argue that Hendrian would have made the same benefits election regardless of the miscalculation. Indeed, Hendrian testified that he "ha[d] no idea" whether he would have selected a different form of benefit had the initial estimate reflected a $72 reduction. (Pl. Dep., p. 68:16-24). Nevertheless, the entirety of Hendrian's testimony raises a genuine issue for trial. Prior to making his benefits decision, Hendrian—who has a B.A. in Economics—performed handwritten calculations based on the miscalculated estimates to determine the best option for him and his wife. (Pl. Dep., pp. 13, 28-29, 33-34, 79-81, Exs. H-2, H-3). Specifically, Hendrian compared the anticipated returns from the various optional forms of benefits in order to decide which option to take and whether to defer social security benefits. (*Id.*). After making these calculations and discussing the matter with his wife, Hendrian made his benefits election based on his need for fixed income and his desire to protect his wife. (Pl. Dep., pp. 33-34). Accordingly, whether Hendrian and his wife would have chosen an alternative form of benefit had Hendrian based his calculations on the correct figures is a disputed material fact requiring resolution at trial. *Cf. Curcio*, 33 F.3d at 237 (concluding beneficiary reasonably relied upon plan's representations regarding supplemental insurance program where beneficiary and her husband discussed options available under the program and forwent opportunity to purchase other insurance through an independent carrier).

## C. Estoppel (Count VI)

In Count VI, Hendrian claims he is entitled to relief under section 502(a)(3) based on an equitable estoppel theory. (Doc. 1, ¶¶ 44-49). To succeed under this theory, an ERISA plaintiff must establish (1) a material misrepresentation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances. *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1881 (2011); *Pell v. E.I. DuPont de Nemours & Co.*, 539 F.3d 292 (3d Cir. 2008). We have previously concluded that there are triable issues of fact as to whether Defendants made a material misrepresentation and whether Hendrian relied to his detriment upon that misrepresentation. Therefore, in order to prevail on summary judgment, Defendants must demonstrate the absence of a genuine issue regarding the existence of extraordinary circumstances.

Extraordinary circumstances, for purposes of an ERISA estoppel claim, exist in several factual scenarios that have been identified in the case law. *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996). Specifically, affirmative acts of fraud, a network of misrepresentation over an extended course of dealing, and the presence of an especially vulnerable plaintiff all constitute extraordinary circumstances. *Pell*, 539 F.3d 292, 303-04 (3d Cir. 2008). In *Pell*, for instance, the Third Circuit affirmed the district court's finding of extraordinary circumstances where the employer repeatedly misrepresented the employee's benefits calculation date over an extended course of dealings. *Id*. Significantly, the employee diligently and persistently inquired into the employer's representations

regarding his pension over a 15 year period. *Id.* By contrast, "simple ERISA reporting errors

or disclosure violations, such as a variation between a plan summary and the plan itself, or

an omission in the disclosure documents," do not give rise to extraordinary circumstances.

*Kurz*, 96 F.3d at 1553; *see also Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1314,

1318-19 (3d Cir. 1991) (finding extraordinary circumstances not present where insurer

refused to pay life insurance benefits based on unsatisfied eligibility requirement that was

omitted from plan brochure).

In this case, there are no allegations of fraud or bad faith, and there is nothing to

suggest that Hendrian is an "especially vulnerable" plaintiff. Instead, the parties dispute

whether there has been a "network of misrepresentations." Defendants contend that the

miscalculation amounts to a single misrepresentation; Hendrian argues that the error

resulted in repeated misrepresentations each time a payment was made over the course of

three years. (Doc. 18-1, pp. 20-21; Doc. 20, p. 10). The Court concludes that determination

of whether this situation presents a network of misrepresentations over an extended course

of dealing requires further factual development and is not susceptible of resolution on

summary judgment.

The misrepresentations—an incorrect benefit estimate followed by payments in that

amount—resulted from a single miscalculation. Unlike *Pell*, where affirmative

misrepresentations were made by numerous individuals in response to inquiries spanning

more than a decade, the multiple misrepresentations here were computer generated

estimates and automated disbursements. In further contrast to *Pell*, Hendrian did not "diligently" question the amount of his benefits or the accuracy of the calculation. Instead, Hendrian made his election after confirming only the accuracy of his employment data. (Pl. Dep., pp. 38-41).

On the other hand, Hendrian testified that in the three years prior to his separation from AstraZeneca, he checked his pension estimates "probably five or six, seven times." (Pl. Dep., p. 12:22-24). Following his retirement, Hendrian also requested pension election documents containing his estimated benefits at least three times. (Pl. Dep., pp. 23-24, 27-28, 30). Like the plaintiff in *Pell*, Hendrian was arguably "persistent" in verifying his pension amount "over an extended period of time." *Pell*, 539 F.3d at 304. Furthermore, the alleged misrepresentation did not take place "in a single conversation." *Id*. Instead, the alleged network of misrepresentations occurred in multiple communications such as pension estimates, a benefit election package, and a benefit commencement verification letter. (Pl. Dep., Exs. H-2, H-3; Doc. 18-3, Exs. C, F). In light of the forgoing and the limited record on summary judgment, whether Hendrian can demonstrate the requisite extraordinary circumstances presents an issue for trial. *Cf. Smith v. Hartford Ins. Group*, 6 F.3d 131, 142 (3d Cir. 1993) ("On the [summary judgment] record before us, we believe a factfinder could find [extraordinary] circumstances are established, in light of . . . repeated oral and written misrepresentations to [plaintiff], his diligence in attempting to obtain accurate answers regarding his wife's coverage . . . and the immense coverage expenses at stake.").

## D. Waiver (Count V)

In Count V of the complaint, Hendrian claims that the Defendants' miscalculation of benefits over a three year period constitutes a waiver of their right to recalculate his monthly payment or recoup any overpayments. (Doc. 1, ¶ 41). Defendants argue that the Plan's prompt action upon learning of the miscalculation demonstrates that they never intentionally relinquished any rights under the Plan. (Doc. 18-1, p. 18).

"In an ERISA action where the plaintiff contends that the [defendant] waived a requirement of the policy through its actions, it is the plaintiff's burden to show that there is a waiver." *Everett v. United of Omaha Life Ins. Co.*, 2013 WL 5570222, at *7 (M.D. Pa. Oct. 9, 2013) (citations omitted). In general, waiver "connotes some kind of voluntary knowing relinquishment of a right." *Green v. U.S.*, 355 U.S. 184, 191 (1957). However, there is no precedent in the Third Circuit regarding the applicability of waiver in ERISA cases. *See Everett*, 2013 WL 5570222, at *9. In the absence of controlling authority, district courts in this circuit have performed case-specific waiver analyses. *Pergosky v. Life Ins. Co. of North America*, 2003 WL 1544582, at *6 (E.D. Pa. March 24, 2003). Those courts have refused to apply waiver where it would expand the scope of coverage under an ERISA plan to an otherwise ineligible participant. *Everett*, 2013 WL 5570222, at *9. The doctrine of waiver has also been found inapplicable "where the issue is the existence or nonexistence of coverage." *Pergosky*, 2003 WL 1544582, at *6 (quoting *Juliano v. Health Maintenance Org. of New Jersey, Inc.*, 221 F.3d 279 (2d Cir. 2000)).

In this case, Hendrian's eligibility for retirement benefits under the Plan is not at issue. Instead, the dispute centers upon the amount of Hendrian's benefits under the Plan and the timeliness of Defendants' recalculation of those benefits. Thus, finding that Defendants waived their right to recalculate the amount of Hendrian's benefits or recoup the alleged overpayments would not expand coverage beyond the provisions of the Plan to an ineligible participant. The Court therefore concludes that there is a triable issue of fact as to whether Defendants have waived rights they might otherwise assert to justify their actions. Thus, determining whether the Defendants knowingly and voluntarily relinquished the right to recalculate Hendrian's benefits requires further factual development. Specifically, the circumstances surrounding the miscalculation, the timeliness of Defendants' discovery and correction of that miscalculation, and the basis of Defendants' right to adjust and recoup benefits present factual issues for trial. Accordingly, summary judgment is denied.

## E. Equitable Restitution and Other Relief (Counts II and III)

In Counts II and III, Hendrian seeks equitable restitution and injunctive relief under section 502(a)(3) of ERISA. (Doc. 1, ¶¶ 25-32). Section 502(a)(3) authorizes suits to enjoin violations of ERISA or the terms of an employee benefit plan. 29 U.S.C. § 1132(a)(3). That section also allows a plan participant to seek "other appropriate equitable relief" to redress such violations or to enforce provisions of ERISA or the terms of a plan. *Id.*

"[A]ppropriate equitable relief" refers only to those categories of relief that were typically available in equity. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204,

210 (2002). A plaintiff may seek "restitution in equity . . . where money or property identified

as belonging in good conscience to the plaintiff c[an] clearly be traced to particular funds or

property in the defendant's possession." *Id.* at 213. "[F]or restitution to lie in equity, the

action generally must seek . . . to restore to the plaintiff particular funds or property in the

defendant's possession." *Id.* at 214. Injunctions that afford prospective relief, as opposed to

retrospective remedies such as compelling payments of money past due, are permissible

equitable remedies under ERISA. *Pell*, 539 F.3d at 307.

Here, Hendrian seeks restitution for the reduction of benefits that began in October

of 2012. (Doc. 1, ¶¶ 26, 29). Hendrian also requests that AstraZeneca be enjoined from

making future payments in an amount less than the $3,828 per month he initially received.

(*Id.*). Defendants argue that the relief sought is not appropriate because Hendrian is not

entitled to the $3,828 under the terms of the Plan and that restitution would unjustly enrich

Hendrian. (Def. Br., pp. 11-12). The Court concludes that Defendants are not entitled to

summary judgment because equitable relief may be appropriate if Hendrian ultimately

prevails on his federal common law claims brought under section 502(a)(3).

Even if Hendrian is not entitled to $3,828 under the terms of the Plan, this does not

preclude equitable relief. If Hendrian prevails on his claim for breach of fiduciary duty or

equitable estoppel, then an injunction affording prospective relief or equitable restitution in

the form of a constructive trust may be permissible remedies. *See Pell*, 539 F.3d at 308

("Our case law clearly establishes the right of a plaintiff . . . to receive relief beyond the

benefits specified in the plan . . ."). Additionally, if Hendrian is unsuccessful in his denial of benefits claim, he may be entitled to an equitable remedy if he establishes that equitable considerations weigh against recoupment. *Cf. Dandurand v. Unum Life Ins. Co. of America*, 150 F. Supp. 2d 178, 186-87 (D. Maine 2001) (holding that balance of equities weighed against requiring beneficiary to repay overpayments received as a result of plan's miscalculations). For the forgoing reasons, Defendants are not entitled to summary judgment with respect to Hendrian's claims for equitable relief.

## VI. CONCLUSION

Based on the foregoing considerations, Defendants' Motion for Summary Judgment (Doc. 18) is **DENIED**. A separate Order follows.

Robert D. Mariani
United States District Judge